Fourth Circuit held that a provider of basic communications infrastructure to millions of homes and businesses can be held liable because it did not kick enough accused infringers off the Internet. No notion of tort or copyright law ever conceived can support that theory. This court explicitly rejected the theory in Twitter where it said, quote, Plaintiffs have identified no duty that would require communication providing services to terminate customers after discovering that the customers were using the service for illegal ends. This court said in Grokster that liability cannot be predicated on, quote, mere failure to take affirmative steps to prevent infringement. Reaffirming those basic principles resolves this case. No case has suggested that knowledge alone can create the necessary culpability to find someone liable for infringement. The consequences of plaintiff's position are cataclysmic. There is no surefire way for an ISP to avoid liability, and the only way it can is to cut off the Internet, not just for the accused infringer, but for anyone else who happens to use the same connection. That could be entire towns, universities, or hospitals. Turning Internet providers into Internet police for all torts perpetrated on the Internet will wreak havoc with the essential medium through which modern public engages in commerce and speech. This court should reverse. I welcome the court's questions. How far do you go with Twitter? We were dealing with a totally different matter than we have here. Well, Your Honor, the question of how far one goes with Twitter, when you think about the different... In the sense of how does it apply here? Oh, so Twitter's held several things that are fully applicable here. The first is that contributory liability requires malfeasance with the purpose of fostering the bad act. There's no liability for passive nonfeasance, and there's no liability for sales to the general public on the same terms regardless of any eventual use. We are an a-for-she-are case of Twitter. Twitter at least had those communications on its own server. They were visible to Twitter. What our customers do is invisible to us in real time. Knowing that a particular account will infringe does not make us an accomplice, which is what's required for contributory liability. Continuing to supply the internet is just not the same as joining with the tortfeasor in quote mind and hand in the infringement as in something that the ISP wants to... What is the basis of this contributory liability? Your Honor, the basis of contributory liability for copyright, as this court recognized in Sony, is just sort of adopting the common law in a world in which the Copyright Act itself does not prescribe secondary. So do we do that in a broad adoption of common law as we had in Halberstam, or is it narrower than that? Well, Your Honor, it must be, I would say, the narrowest version of common law that is available precisely because Congress did not speak directly to it. And so I would say Halberstam merely articulates a way of getting at the ultimate principles that the Copyright Act, excuse me, that contributory liability is directed at. But Twitter and Smith & Wesson apply it to the exact sorts of circumstances here, which is where you've got an arm's length seller selling to millions and millions of people. I guess I wonder, Mr. Rosenkranz, this goes back to Justice Thomas's first question, whether this really is a fortiori from Twitter. I mean, in Twitter, we spent a lot of time talking about the fact that the companies, Facebook and so forth, didn't know of any particular conduct that had led to the attack. It wasn't even clear that the terrorists in Twitter had used those companies to plan the  So we said that there was no real nexus between the companies and the actual communications that created the legal issue. Now, here, your client has received notice as to particular people doing particular infringements of copyright. And I would think that that's a step further from Twitter. Well, so, Your Honor, it's a step further in one respect, and it's a step in the other direction on the other end of the spectrum. So on one end of the causation spectrum, we can't see in real time what people are doing. That, as I said, distinguishes us from Twitter and makes us more remote. You are right that on the other end of the spectrum, there's a slightly greater nexus. But I hasten to add, it is still a limited nexus. When we get pinged about a regional ISP with tens of thousands of users, we know that somewhere, someone in that community has infringed. That's true sometimes. It's not true other times. And there's no evidence that it's true here. In other words, there are plenty of times where you're getting, you know, that there's a link to a specific individual, and you know who that individual is. You would not have to cut off anybody else. And you know that that individual has infringed. Your Honor, I beg to differ. There is literally not a single place in this record where a specific individual was identified. If you, let's take the smallest unit, a household, you still don't know who the individual is. I also beg to differ on the first half of what you said, Your Honor, that there's no evidence that what I've described has happened here. Page 11 of our opening brief gives you the nature of the highest recidivist infringers. They are 15 regional ISPs, 10 universities, 9 hotels, and so forth. Those are the entities that are most likely to be cut off first, because those are the ones that accrue the greatest number. But you're going to the greatest degree. The safe harbor doesn't require you necessarily to terminate someone. But what I'm troubled by is that you got these reports, and it's about 1% of your customer base who's infringing. There are things you could have done to respond to those infringers, and the end result might have been cutting off their connections. But you stopped doing anything for many of them. You didn't try to work with universities and ask them to start to look at an anti-infringement notice to their students. You could have worked with a multifamily dwelling and asked the people in charge of that dwelling to send out a notice or to do something about it. You did nothing. And in fact, counselor, your client's sort of laissez-faire attitude towards the respondents is probably what got the jury upset, meaning you're talking something very different than Twitter, where it's not even clear that their websites were being used for the specific attack at issue. Here, you know that a particular location is infringing, and most of the time you're doing nothing. Why aren't you contributing to that infringement? So, Your Honor, a couple of things. First, on the first point you made, the DMCA does purport to require termination, and it is the failure to terminate— But there's at least 10 steps before that. I'm talking about the DMCA, the statute itself. The statute. The safe harbor. And that was the theory of liability, that we did not terminate people enough. Plaintiffs in their brief to this court for the first time have made the assertion that you will find nowhere in the Court of Appeals brief that we did nothing. The notion that Cox did nothing is absurd. I will mention just three facts that are undisputed. First, Cox invested its own resources to create the first of its kind anti-infringement program. There was no precedent for that. Second, under that program, Cox sent out hundreds of warnings a day. To your point, Your Honor, that we didn't work with universities, we most certainly did. The first several steps, the 13 steps, are all about contacting them, cutting them off, that is, suspending their accounts, which we did 67 times—67,000 times—in the course of this period. That's thousands every month, month and third. The program stopped infringement by 98 percent of the people who were accused of infringement. That is not nothing, Your Honor. Well, you say you're comfortable or not comfortable, but you don't like the Ninth Circuit's test. But then you go on to say that you've already taken a lot of measures, and that those have been highly effective, and they far exceed any conceivable notion of simple measures. So why should we be terribly worried about that? You're able to comply with it. You don't—so what's wrong with that? It doesn't present such a burden to you. You say you far exceed it. Well, so, Your Honor, you're asking what is the problem with the simple measures test? Yeah. Oh, well, so— Because you still believe you far exceed whatever conceivable notion of simple measures. We most certainly—yes, Your Honor, sorry. Okay, so what's wrong with that test? So what is wrong with that test is that it does not comply with what this Court has said and the common law has been saying for 100 years. Okay, but that's different than saying what the practical impact on you is. I'm not complaining about the practical impact on us. We easily meet the simple measures test, and I would underscore that plaintiffs have not asked this Court to apply the simple measures to us and have not argued that we could not meet the simple measures. But, counsel, can I— Go ahead. What incentive would you have to do anything if you won? If you win and mere knowledge isn't enough, why would you bother to send out any notices in the future? What would your obligation be? For the simple reason that Cox is a good corporate citizen that cares a lot about what happens on its system. We do all sorts of things that the law does not require us to do. But don't you do these notices in an effort to get to safe harbor, and aren't you sending these notices to avoid liability? You would have no liability risk, right, if you win going forward. That is correct, but I want to underscore my answer to— Let me stop you there. I mean, if purpose is the test, nobody—very few bad actors come out and say, I intended to do something awful. You infer it from circumstances, and a jury could still infer purpose from your knowledge and some other actions, right? So, but, Your Honor, my answer is no, and I agree with you that the way one conducts this analysis is not to say, oh, purpose is the test. The way one conducts the analysis is to— So you disagree with the government on that? No, I don't think the government is saying that purpose is the standard, but we— That's exactly how I read its brief. Perhaps I'm missing something, and Mr. Malcolm can help me there. What the government and we both contend is that there are acts that can be—from which one can impute intent, and in the context of a seller, in particular a seller of communications technology, this Court has held that unless it is a technology that is incapable of multiple uses, that is, non-infringing uses, you don't infer intent from what is an equivalent— We don't have to go that far, though, to recognize that the jury instructions here are improper, do we? No, you don't have to go that far to recognize that both the jury instructions here, and in particular, the Ninth Circuit's holding that the instructions as applied to this set of facts could sustain liability. Let me ask you if I've got it right, okay? The narrowest version of your argument. Perhaps not everything you want. The statute doesn't mention secondary liability, so we should be cautious. And in fact, in Central Bank of Denver, we refused to infer secondary liability in a statute that had no explicit cause of action. But here we are. Sony did it, so okay. The narrowest version of that requires purpose. And we've said that many times. Knowledge isn't enough. There are various ways one can infer purpose, such as through inducement or the fact that the thing you're selling doesn't have any other lawful use. There may be other ways to infer purpose. And the jury instructions here didn't contain purpose, just knowledge. So therefore, reverse. Anything wrong with that syllogism? There's nothing wrong with the syllogism, just one quibble. We're not challenging the jury instructions. We're making a JMAL argument. But yes, everything else you said, I completely agree with. That what the Fourth Circuit did was to say that continuing to provide internist service with the knowledge that someone on that account is likely to infringe again, that that is the culpable act. And that is just absolutely not correct. This court rejected that exact theory in Twitter. I would remind the court to the questions asked earlier about whether Twitter goes that far. There was knowledge in Twitter of actual accounts. I understand it was not knowledge of specific acts of terrorism. But knowledge was very much a part of that case. So is it your view that selling Internet services can never be culpable conduct? Is that the position that you're taking? Your Honor, the position we're taking is not that an ISP can never be culpable, but an ISP can be culpable only if it engages either in clear expression, such as inducement, or in affirmative acts that align itself. And the affirmative act can't be continuing to provide Internet services to a known infringer. That is correct. Because that is simply another way of packaging the non... Let me give you a hypothetical and you tell me whether or not liability lies. Suppose I come to you and I want to buy your services. I tell you that I, as a customer, am addicted to infringing on the Internet. I've been sued before. I know what I'm doing is illegal, but I just keep doing it. And not only that, Cox, based on where I live, is my only option. At my new house, it's the only way that I can get Internet services. If Cox sells to me, knowing all of that, you still say no liability for secondary liability in that situation. That's correct, Your Honor. That's a difficult hypothetical that pushes the envelope. That's the point of the hypothetical. Yeah, understood. Let me just underscore. The facts you recited are facts that would make it totally plausible and, in fact, would invite the plaintiffs here to sue that infringer directly. They have recourse in a situation like that. Can I follow up? Sure. I just wanted to say, under those facts, would there be liability under common law, sort of general aiding and abetting principles? Wouldn't that be enough to sustain liability? No, Your Honor. The reason that it wouldn't be enough for Cox, in this case, is exactly the reason that it wouldn't be enough under the common law. The common law also requires a culpable act, not the equivocal act, of selling to everyone on equal terms. Smith & Wesson says that, and Twitter says that, too. That is an equivocal act that does not align oneself, that does not align the seller with the purpose of promoting infringement. Thank you, counsel. Justice Thomas, thank you. Justice Alito? You have competitors in providing Internet services. Would you dispute the proposition that your client has a financial incentive not to become known as an Internet service provider that is aggressive in terminating service for infringers? Your Honor, hypothetically, I can imagine that being true. But the facts of this case are 21% of traffic to the other ISPs was infringing. We were two-thirds of that. So the notion that we had a particularly impressive track record of reducing infringement did not deter us from, excuse me, of reducing infringement, did not deter us from having a program that worked to the point of 98% success. Is there evidence in the record that you have a financial incentive not to terminate infringers? We have a financial incentive, like any business does, to keep our customers. But the Fourth Circuit found, and this was a basis for rejecting vicarious liability, that we did not have a financial incentive to increase infringement. If purpose is the test, would you disagree that there can be circumstances in which a repeated refusal to do anything about infringement by the holder of a single user account could be sufficient to give rise to an instance of purpose? Suppose that we're not talking about a multi-user account. We're talking about an individual user account. And the copyright holder notifies the ISP that this particular account has, over the course of six months, has violated the copyright 50 times. And the ISP does nothing in response to that notification. And then after the 50th notice, it begins to send out just a very tepid warning, what you're doing is really not very nice. But 50 more occur over the course of the next six months. At some point, and this could go on indefinitely, at some point would there be enough to infer a purpose? No, Your Honor, because there could be all sorts of reasons why an ISP does not want to cut off a customer. And it's not just a customer who, in your hypothetical, confesses that he's going to continue infringing. I think another way of answering the question is, think about the flip side. In order to capture that fringe case, we would have to create a world in which ISPs are going after everyone who infringes, including not just that one individual user, of which we have no evidence in this record that we ever knew about that one person, but the regional ISPs and the hospitals and the universities, because that is a world in which at $150,000 per pop, the ISP has a huge financial incentive to cut off the accused infringer at the word go. I will underscore that in that table on page 11, of the 49 infringers who had more than 100 notices, only one was a single-unit home. Everything else were the sorts of businesses and multi-unit dwellings that I described. Justice Sotomayor? Your last concession, doesn't that suggest, even if there is some error here, that you've admitted some liability, potentially, when you say there was one single-person home involved? That would seem to me the clear example of Justice Jackson's hypothetical, which is, if I'm a gun dealer and I'm selling to someone who says to me, I want to kill my wife with this gun, I think the common law would say, you knew what he was going to do with the gun, you joined in. Why isn't your continuing to provide internet service the same? Well, so a couple of answers, Your Honor. When you know that that particular location is going to continue to infringe. So a couple of answers. I certainly didn't concede that there would be liability. I said, of the top recidivists, there was only one single-family home. We still don't know the identity of the... Why does that matter? Meaning, if you know that a particular location and someone in it is committing a crime, and you're supplying to that person, and perhaps others, it doesn't matter what the others are doing, but you know some person in that home is infringing, why aren't you participating by giving them the tool to infringe? Well, because, Your Honor, it needs to be an act that unequivocally demonstrates a purpose. You're thinking of Betamax, but in Betamax, it was a piece of equipment where the seller had no continuing connection to the equipment. You sold the equipment, somebody could use it legitimately or not, you couldn't control them. But here, you have control over the instrument of infringement. Your Honor, I'm not just talking about the Sony case. Rockster reiterated the same point. Twitter, if the rule was that the rule is different if there's an ongoing relationship, then Twitter would have come out differently. By the way, direct sales underscores that point too, and that was 80 years ago. That is part of the... What it said was, these people were selling something that they knew this doctor would be using illegally. He would be prescribing or not prescribing. He would be giving away drugs not in accordance with medical standards. No, Your Honor. So how is that different from this situation? This court explained in Smith & Wesson why it's different, and it said explicitly, it was not just that there was an ongoing relationship. You can't win on Smith & Wesson because the manufacturers sold to dealers, who in turn sold to individuals, to individual gun stores. Thank you, counsel. Can I just answer the question there? I'm not citing Smith & Wesson's answer to your question. I'm citing Smith & Wesson for its analysis of direct sales. And what the court said in Smith & Wesson about direct sales was, ongoing wasn't enough. It was the stimulation of further sales and treating that buyer differently from others. That was the key that created culpability. Justice Kagan? I take it from your answers that it really doesn't matter whether Cox is a good corporate citizen. You know, there's a lot of talk in your brief and in Mr. Clement's brief. Is it a good corporate citizen? Is it a bad corporate citizen? But as I understand your argument, it could be the worst corporate citizen of all time. And still, it doesn't matter that there would be no liability. Is that right? That's correct. But I was making the point earlier about the corporate citizen in response to the question, why would an ISP continue to provide anti-infringement programs if they don't have to? And I was simply saying... Okay, but it's basically irrelevant to the matter at hand, to the liability rule. It is irrelevant, both the invective from plaintiffs and my protestation. You're crowing. And if that's so, what would the safe harbor provision mean? It would seem to be, you know, utterly, it would seem to do nothing. Well, see, Your Honor, Congress can... Why would anybody care about getting into the safe harbor if there's no liability in the first place, is I suppose the question. Right, so Congress can adopt a safe harbor for all sorts of reasons. Here, Congress did it to assure service providers at a point in time at which the law was really unknown. Right, but I take your point about how Congress may have thought this was a good thing to do because we don't know what the liability rule is. But once the liability rule becomes what you think the liability ought to be, do you agree that then the safe harbor provision is not going to be doing anything at all? 27 years later, the safe harbor provision, by light of this court's ruling that came a generation after the... You agree? Correct, yes, I agree. Thank you. Justice Gorsuch. Justice Kavanaugh. On the word purpose, I think that's going to be key, and it's kind of a slippery word in this context. I want to make sure I nail down what you mean in response to Justice Gorsuch about what can be used to show purpose. Mere knowledge alone cannot show purpose. Purpose can't be inferred from mere knowledge, is your point, correct? That is correct with one caveat. It can be shown when the only use of the device is an infringing... I'm assuming that there are substantial non-infringing uses, and then you go to the next step, which is purpose, and I want to make sure mere knowledge, not good enough. What is good enough under our precedence, in your view, if you could articulate it clearly, what you think is good enough to show purpose? There are two things that are good enough. One is inducement, which are generally words that are directed at encouraging infringement. The other is affirmative conduct directed at fostering infringement. For example, if an ISP were to provide an anti-infringement detection buster, something that hides the ISP address from the mark monitors of the world that detect infringement, that would be an affirmative act that's built into its device that aligns itself as someone who desires for the infringement to occur. Another possibility is if the ISP creates a service that is uniquely designed to help individuals take streaming services, the songs off of streaming services, download them and swap them. Those are classic examples of affirmative conduct that amounts to material content. So that's affirmative conduct. What are some examples of inducement? Oh, here, let me help you infringe. We have an infringement outline. Advertisements or specific pitches that are designed, I don't want to put words in your mouth, but is that what you're getting at? Sure. Or even an employee who will instruct people how to go about getting BitTorrent on their computers. Thank you. So in your understanding of Twitter, would it be enough for contributory vicarious liability aiding and abetting if Twitter knew that a particular account was being used for child trafficking and didn't take it down, didn't cut the user off? They know it, but they're not doing anything to facilitate or encourage. Twitter obviously has X, has lots of other purposes. So I think that's a hard case. I don't know how Twitter would come out on that. Everything Twitter said about affirmative conduct and malfeasance versus nonfeasance, I would say, would drive the conclusion the same way that Twitter ultimately drove it. Now, I can imagine this court someday carving out an exception for life and limb or imminent danger of physical harm. But your basic answer is that based on your understanding of Twitter, unless we carved out that kind of exception, your theory of aiding and abetting liability anyway is that there would not be liability. That's correct. I mean, this court said in Twitter what I said right at the outset of my argument, that plaintiffs have identified no duty that would require communication providing services to terminate customers, terminate them, after discovering that the customers were using the service for illicit ends. I'm just reading what this court said in Twitter. Well, you know, Justice Kagan is right that in Twitter and in Smith & Wesson, it was a bit more attenuated. You're putting it out in commerce, but the knowledge link was not as strong as in the hypothetical I gave you or in the hypothetical that Justice Jackson gave you. Do you understand aiding and abetting liability to be coextensive with the kind of contributory infringement liability we're talking about here? In other words, is anything that we say here, if we adopt your theory here, is that necessarily going to carry over to the aiding and abetting context? I would think so, Your Honor. This court has always treated those two lines of cases interchangeably. When this court asks what the common law is of copyright contributory liability, it is looking to, back to Kalem, accomplice liability. So what this court says here will apply to other contexts, except if there's a statute that changes the common law, and vice versa. What this court said in Twitter and in Smith & Wesson should apply with full force to this version of common law liability. Last question, and this is a record-based question, just so that I can be clear on how this works. So this department that sends the notices, the one that Paranoid Panda, the employee, was concerned about, is it dedicated entirely to copyright infringement, or is it also detecting accounts and taking them down either because of failure to pay or other kinds of things? So, Your Honor, it's called the abuse team, and so it tracks all sorts of abuses. It got 5.7 million notices in the particular period. It was reacting not just to copyright, but to the point I was beginning to make earlier. It reacts to phishing. It reacts to fraud claims. It reacts to hacking, none of which there is a legal duty to act. Justice Jackson? I guess I'm not sure I understood your answer to Justice Barrett's question about the coextensive nature of aiding and abetting liability and the kind of liability we're talking about here, because I understood you to be rejecting material contribution, and I thought material contribution was a form of aiding and abetting liability. So maybe I'm confused. Are you rejecting the material contribution theory? No, absolutely not, Your Honor. We embrace the full breadth of contributory liability that includes inducement and includes material contribution, and I gave Justice Kavanaugh a few examples of how material contribution works in your view. How it would work in the ISP context. I'll hasten to add, though, the fact that there are not a lot of examples is a function of plaintiff's decision to sue the one technology that is least likely to fit a fact pattern of material contribution. That's only if you define it as being only Grokster or Sony. In other words, it depends on how you define material contribution, and I take your definition to be narrower than what I think respondents will say. Oh, it's definitely narrower than what the respondents will say, because respondents have never purported to identify an affirmative act to foster infringement. Their argument is knowledge alone is what satisfies. And your argument is knowledge plus providing the service, providing the service, internet service, is not an affirmative act. Do I have that right? That is correct. We are providing the internet service and declining to terminate. Individual customers or ISP addresses, which makes it, some would say, different than Twitter, because Twitter was just, they were putting up a platform that people were using. You've got contracts with individual people that you're providing internet service to, correct? So contracts, yes, but there was an ongoing relationship in Twitter with all of the customers. Known, known in ways that you can isolate the ISP address and the places where the infringement is coming from. We know the IP address. If it's a regional ISP, there are 10,000 possible homes or businesses who could be infringing. And as I was saying earlier, that's the first that will have to get cut off under this liability scheme. All right, well, let me ask you, just in copyright law in general, my understanding is that Congress's goals are key. And I appreciate your view, and it's true that Congress hasn't provided statutory liability. But I do think, based on the statute that we have here, Congress understood that common law liability could arise. And so what concerns me a bit is you're encouraging us to adopt a common law rule that essentially eliminate liability in this situation. I guess I'm coming at this by looking, as several of my colleagues have pointed to, the safe harbor. Congress told us in the legislative history what the safe harbor was about. In one of the reports, the House report, Congress said that it wanted to, quote, preserve strong incentives for service providers and copyright owners to cooperate to detect and deal with copyright infringements. And so even though there isn't secondary liability in the statute, it appears as though Congress sought to use the liability risk that exists in the common law to incentivize this cooperation. And as several have pointed out, you seem to be undermining that because we no longer have the incentives if we interpreted this the way that you would have us do. So two answers, Justice Jackson. The first is, just to continue the answer I was giving earlier, Congress had no clue what the liability would end up being against four different types of service providers. For back then, service providers were confronting all sorts of theories of liability, it included direct liability because you have to copy- Right, but I'm positing that Congress's interest was not necessarily to protect ISPs. I appreciate that that's in there. But what I'm pointing to is the part of the legislative history in which Congress said we are setting this up as an incentive for these ISPs to actually do things to address copyright infringement. Right, so a couple of answers to that. First, I will get to the legislative history in a moment, but first and foremost, what Congress said was in 512L that the failure to satisfy a safe harbor, quote, shall not adversely bear on liability. And it punctuated this point in the Senate report. It was, quote, leaving current law in its evolving state because it had no idea and most certainly couldn't agree upon- Correct, and the evolving state allowed for liability under certain circumstances. So if we now interpret this to not allow for liability, I'm a little worried we're undermining Congress's intent. Your Honor, Congress had no idea what the liability would allow. There was no case at that point providing for liability for ISPs that is holding them liable. Ultimately, I will also underscore, there was no such thing as a conduit ISP. That was a creature of 512A. The AOLs of the world were hosting content. So Congress, one cannot impute to Congress any view and certainly not any unified view about what the liability rules would be in the absence of the DMCA. Thank you. Thank you, Counsel. Mr. Stewart? Thank you, Mr. Chief Justice, and may it please the Court. In Grokster, this Court held that one who distributes a device with the object of promoting its use to infringe copyright can be held liable for its user's infringement. In Twitter and Smith and Wesson, the Court emphasized that to be liable for aiding and abetting, a person must participate in the primary violation as in something that he wishes to bring about and seek by his action to make it succeed. Thus, both in copyright law and more generally, this form of secondary liability is reserved for persons who act for the purpose of facilitating violations of law. Because Cox simply provided the same generic internet services to infringers and non-infringers alike, there is no basis for inferring such a purpose here. I welcome the Court's questions. Mr. Stewart, in Sony, Justice Stevens was clear that there was no secondary liability provision in the copyright law, and he relied on the existence of secondary liability in the patent statute and borrowed from that for his argument that there would be secondary liability in copyright. How much should we borrow from either patent law or from common law with respect to in developing our secondary liability jurisprudence under copyright? I think probably the first place you would look is general principles of aiding and abetting law, which are common law principles. But if the Court thinks maybe intellectual property cases are different, it could look to Congress' codification of secondary liability principles in the Patent Act. And it's very clear that in patent cases, the Patent Act doesn't provide for secondary liability in circumstances like these. The Patent Act in 35 U.S.C. 271b says whoever actively induces infringement of a patent is liable. And Section 271c says anyone who sells a device that is specially suited to patent infringement, not capable of substantial non-infringing uses with knowledge of its special character, is liable. There's nothing in the Patent Act that says if you sell a multi-use device to a person that you know is going to use it for infringement, you can be liable on that basis. So I think it would be unusual to adopt a special rule of copyright law and ignore the rule of patent law that Congress has actually adopted in the U.S. Code. Do you read patent law, then, to be the same as the common law of aiding and abetting? Yes. I mean, I think the patent law, as it's currently codified, incorporates the two bases for secondary liability that the Court adopted in Grokster and Stoney, in Stoney, as principles of copyright law. That is, in Grokster, it said the law that one who induces infringement can be held liable was a common law principle before it was codified in 1952, and we adopted here as a principle of copyright law. Similarly, in Stoney, it said we adopt the staple article of commerce doctrine from patent law as a principle of copyright law, that ordinarily, if you sell a staple article of commerce, one capable of both infringing and non-infringing uses, you won't be liable for the misuse made by individual customers. I was going to say, to follow up on Twitter, the two things that we think, we agree that the suit in Twitter had problems that, in addition to the ones that we're noting here, that is, even if the platforms in Twitter had highlighted content celebrating ISIS, they could have been liable for aiding and abetting a particular attack, only if a causal connection could be shown between those videos and the attack, and there was no such proof. But I think two aspects of Twitter are deeply relevant. The first is, five different times, the Court in Twitter quoted in whole or in part the standard that I just read, that a person who aids in a bet, who is liable for aiding and abetting, must be shown to have participated in the wrongdoing as something he wishes to succeed, and that standard can't be satisfied here. The second thing the Court in Twitter emphasized time after time was that, at worst, the platforms had simply treated ISIS the same as they had treated other users. So does that mean that your answer to the question I asked Mr. Rosenkranz is that, yes, Twitter would not be liable for facilitating child trafficking if it knew that a particular user was using its account for that purpose? It wouldn't be secondarily liable. That is, I think lurking in Twitter was the idea, and the companion case, Google versus Gonzalez, was the idea that perhaps a platform like YouTube or Twitter, a platform on which potentially infringing or otherwise unlawful content actually appears, the platform could be held directly liable on the theory that it was speaking the words as well as assisting the third-party content provider in doing so. This is a little far down in the weeds, but in the Communications Decency Act of 1996, 230C1 said generally that platforms that host third-party content will not be treated as the publisher or speaker of that third-party content. But for purposes of aiding and abetting, your answer is the same. For purposes of aiding and abetting, the answer is the same. Obviously, direct copyright infringement is a strict liability offense. That is, if you think of the platform as the person who's actually speaking or publicly performing the infringing video, then it doesn't matter whether the platform wants to infringe, it can be held liable on that basis. But because COTS just provides the infrastructure, there's no plausible theory of direct liability. Mr. Stewart, I see our discussion revolving around the following dispute. Okay, purpose is the standard. We'll accept that for now. And under patent law, you say there are two and only two ways you can infer that intent from knowledge, inducement and specially equipped things that can only predominantly be used for infringing purposes. Is that right? Yes. Okay. Well, in common law, there were no such limitations in terms of those two buckets, right? You could infer purpose from a wide variety of things. Are you asking us not to go there? I think you can still do that with respect to what I would call targeted assistance. That is, if you are providing assistance to a particular person, and you're not providing it to anyone else, and you know that person is using that assistance to commit a violation. That kind of falls into the second bucket under patent law, in my mind, you know, creating or doing something that's only going to infringe.  But what I'm asking is, okay, under patent law, you're saying those are exclusive ways you can infer intent from knowledge. Those are the only ones that are codified in the patent. Okay. And one could make an argument because this is an implied cause of action, we should be cautious and we shouldn't go further than patent law. And I understand that argument. But in common law, there were no such two buckets. There were many ways you can infer purpose from knowledge and other acts. So are you asking us not to go there because it's an implied cause of action? Or one might say you could reverse the Fourth Circuit simply for failing to apply the purpose test and go back and do it again, your JMOL analysis, with the correct mens rea. I we're not asking the court to disturb the existing body of copyright law, except with respect to ISPs. That is in Sony, the court noted with seeming approval that there were various lower court cases involving things like dance halls, where people were held secondarily liable. So if I just so if I can just summarize, I'm sorry to interrupt. But so you're saying at least for ISPs, we should go no further than patent law? Yes, and particularly with what I would regard as kind of at the opposite extreme from non targeted assistance. That is, in cases like Grokster and Twitter. And in this case, we're looking at a pretty narrow subset of aiding and abetting. We're asking, when can a person who provides a good or service to the general public be liable for misuse of that good or service by some member of the public? My last question, then, why shouldn't we just say, as we might, that the common law require purpose before circuit analyzed it under knowledge being sufficient? Reverse, go back and do your JML analysis again. I think you could absolutely do that. And the flaw in the Court of Appeals decision was that it acknowledged the purpose language, but it said, we typically infer a purpose to cause a particular event from knowledge that the event is substantially certain to occur. And I think there are bodies of law where we care more about knowledge than purpose or objective. But there are others where we don't. And for instance, in equal protection jurisprudence, there's a fundamental difference between a state doing something because it will produce a racially disparate impact and doing something for race neutral reasons, even though it will produce a racially disparate impact. Thank you, counsel. Justice Thomas? Are you worried that our holding, going back to Justice Barrett's earlier question of Mr. Rosenkranz, aren't you worried that a ruling by us, as broad as you're stating it, would be a disincentive for ISP providers to provide any aid to copyright holders? Why would they bother? I mean, I've never heard of prosecutors ever relying on good citizenship concepts. I agree with that. The ISPs might not bother. I would push back a little bit against the assumption that good corporate citizenship would necessarily mean terminating repeat infringers. Imagine a case in which a person, the individual was sued as a direct infringer, and a jury found that on multiple occasions, this person had used the internet to commit direct infringement. Clearly, the court could award damages. And under the copyright act, the court would have authority to fashion an injunction that was reasonably designed to prevent further infringement. But could the district court enjoin the person from ever using the internet again? I don't think so. I think the general rule that equitable relief is supposed to be tailored to the wrongdoing. I don't think you're answering my question. What is left for any inducement for ISPs to, in good faith, try to control infringement? I would agree that not much economic incentive would be left. I'm simply questioning whether that's a bad thing. That is, if we don't think a district court could enjoin a repeat infringer from, again, using the internet. I'm not thinking you are, but I think Congress was thinking that there had to be some inducement, and that's why they provided the safe harbor. They provided the safe harbor, but they also provided kind of the takedown notice provisions of the DMCA. No notices like the ones that were sent here are contemplated by the DMCA. The DMCA does contemplate notices in which different kinds of internet company may be informed. There are particular infringing works on your platform, and we want you to take those down. And if the internet companies do that, the result is a much more targeted approach. It's that you get rid of the infringing materials, but the rest of the platform remains intact, and people can use it. The approach of terminating all access to the internet based on infringement, it seems extremely overbroad, given the centrality of the internet to modern life, and given the First Amendment. Justice Kagan? Justice Gorsuch? Justice Kavanaugh? In your brief, you want us to go further than what Justice Gorsuch suggested. As I understood his question to you, it was, should we just say mere knowledge is not enough to show purpose, and you said, and send it back, and you said that could be okay. But obviously, in your brief, you wanted us to go further than that, and spell out what could show purpose. So what's the advantage of going further versus saying less? Well, the advantage, I guess, is the same one that the court perceived in Twitter, whereas the court held that the case should have been dismissed on the pleadings. And the idea was a suit in which all you could show was that the defendant had provided kind of generic services to the general public, and that some people had misused it, and the defendant had failed to make that stop. That wasn't enough even to get past 12b-6. And so I think there would be an advantage to making clear that in the future, not only should the ISPs win at the end of the day, but they shouldn't be subject to the burdens of litigation if that's all you have. When I asked Mr. Rosenkranz to spell out what could be done to show purpose, do you agree with his answer on that? I mean, I guess the thing I would emphasize, and I'm sorry I don't remember the precise details of his answer, are I would emphasize the differences between targeted assistance and provision of general purpose technology. That is, there are an infinite number of situations in which somebody may provide assistance to one person that he isn't providing to anyone else. Such as? Such as in the dance hall cases, the proprietor of the dance hall was hiring a band to play, and the band was... What would be the equivalence here? I mean, I don't think there would be an ISP equivalent unless, as Mr. Rosenkranz suggested, the COCs provided some special service that would only be useful for infringers. In that case, you could say that this is targeted at infringement. The point about the targeting is, often when you do something for one person that you don't do for anyone else, and you know that person will use the assistance to commit a legal violation, it's reasonable to infer that's why you provided the assistance. But when you are providing internet service to every member of the public who will pay the fee, infringers and non-infringers alike, there's no basis for that infringement. On the patent law analogy, Mr. Clement, in his brief, relies heavily on the Henry case from 1912, and says that it shows that selling a good with the expectation that it would be used to infringe supports contributory liability. So that's a case heavily relied on. I want to get your response to that. I guess I'd make two different points about that. The first is, as Cox's reply brief points out, if you look back at the trial court opinion in Henry, the court's opinion recites that the ink that was being sold was a specially suited ink, specially developed for a mimeograph of this type. And the trial court opinion also reflects that the defendant went to the offices of the purchaser and told her, I'll sell you this ink for your mimeograph, but pour it into an old jar that was provided to you by the patent holder and throw my jar away. And so the word expectation originally came from the trial court's opinion. That was the certified facts. And so I think Henry, on its facts, was a good case for secondary liability. The other thing I would say is, even if you read Henry as standing for a broader proposition, namely that if you sell a multipurpose product to a particular customer that you know will use it to infringe, you can be held liable, that's been superseded by the Patent Act, in which Congress codified other rules of contributory infringement in patent case, but not that one. Thank you. Thank you, counsel. Justice Barrett? Mr. Stewart, you told Justice Gorsuch, this is a follow-up to the same question Justice Kavanaugh asked, that you would be satisfied with our sending it back to the Fourth Circuit and saying, purpose is what you need, you said knowledge was enough. That's wrong. Although you would prefer for us to say purpose can be shown in these two specific ways. What would be the advantage, as you see it, of our taking the narrow approach and sending it back just based on purpose? What do you think we might leave open that we might want to leave open that falls outside of those two categories? I guess, in part, I'll want to hear Mr. Clement's presentation, because I would want to know, does he think there is a plausible basis on which his client might still seek to prevail under a purpose standard when purpose is understood, really intent to bring this result about and desire that it succeed? If Mr. Clement thinks we, on the existing record, we might be able to show that, even in this case, that would weigh in favor of sending it back. Even apart from this case, you know, we're thinking about aiding and abetting liability, we're thinking about beyond this case. I mean, are there scenarios in which you can imagine it being a bad thing for us to say, these are the two ways that you can show purpose, because we might be ruling out secondary liability in other contexts? I would just make it clear that you are limiting your holding to situations in which the plaintiff seeks to impose liability for selling a generic product to a mass audience. And in that circumstance, we're comfortable saying these are basically the only two ways, but we would not want the court to foreclose the possibility that purpose could be shown in a variety of ways when you're providing what I refer to as targeted assistance. How broad do you understand Mr. Clement's theory to be? If, for example, the recording industry or Sony has vendors that detect, as here, that particular households, particular IP addresses are engaged in infringing activity, what if they also sent notices to the electric company? Because clearly, you can't run the internet unless you have electricity for the modem, and said, you are supplying this service and now you have knowledge that it's being used for infringement. I think Mr. Clement would probably say that the DMCA reflects a special focus on internet companies and that it is a justification for inferring potential liability in that scenario when there's no DMCA equivalent for electric companies. Justice Jackson? Thank you, counsel. Thank you. Mr. Clement? Mr. Chief Justice, and may it please the court, this court's case is recognized that liability for copyright infringement is not limited to direct infringers, but extends to those who induce, cause, or materially contribute to the infringement of others. A classic form of material contribution is to provide the means of infringement to a specific known infringer, knowing that infringement is substantially certain to follow. That combination of knowledge of a specific consumer and an ongoing relationship is critical to distinguish culpable conduct from simply engaging in a one-and-done sale of an item that can be used in a way to infringe, but is generally used lawfully. Now, on this record, it is beyond dispute that Cox provided the service to known infringers with substantial knowledge that what they themselves called habitual abusers would continue to infringe. That reality, along with a record chock-full of Cox's admissions that had held the copyright laws and the DMCA in contempt, is what requires Cox to insist on the extreme position that they can continue to provide service to habitual abusers in perpetuity without consequences. That rule has nothing to recommend it and, was admitted today, would render the DMCA and the cooperation it is intended to foster a dead letter. Why bother with a safe harbor? Why worry about a limitation on liability, which is the expressed text of the DMCA, if there's no liability to limit? Why bother cooperating with copyright holders? Why bother having a reasonable and appropriate system for taking down repeat infringers if you're allowed to behave entirely unreasonably? So in all of this, you see that the position that's being advocated by Cox is a product of the record in this case. If Cox is right on the law, then Cox could take tens of thousands of copyright notices and throw them in the trash, and they could have its employees say, F the DMCA. That is, in fact, what the record says, which is why they're asking you for an extreme rule. I welcome the court's questions. How would you give or provide any contours to your approach? We admit, we know that secondary liability is atextual. Are there any limits? Justice Stevens seemed to go to great lengths in Sony to try to peg it to or attach it to the patent law, the patent statute. What would limit your approach? So what would limit my approach is I would say that the provider of the service has to know that specified customers are substantially certain to infringe, and that is, to my understanding, the standard that has long prevailed in the trademark context under the Inwood case, where this court, based on a lower court opinion by Judge Friendly, that was based in part by district court, earlier district court opinion by Judge Wazanski, which was based on the common law, says that you can have liability under the trademark laws if you either induce or you provide the means of infringement to a specific known infringer. So that is the standard. And I think if you limit it to knowledge of specific known infringers and you require, and not purpose, but intent, that requires you to know that providing the service to that customer will make infringement substantially certain, I think that provides a strict limit and plenty of guidance for the lower courts. So when we had Grokster up here, we were, we had a, we used a much more targeted approach. I don't think, how far would Grokster get you? Well, Grokster wouldn't get me very far in this case because this court in Grokster rested its holding on inducement. But if you look at the briefs in Grokster, if you look at the oral argument and what the lawyer for Grokster himself told this court, that was all because... That wasn't you, was it? It was not. It was Mr. Toronto, who's a fine federal judge now. And what Mr. Toronto told this court was that the norm of contributory liability was actually material contribution. But that wasn't an issue in the Grokster case because the Grokster technology was structured so that Grokster didn't know about the infringement of any particular customer. So that's why inducement was where this court essentially had to go in the Grokster case. But I don't think it meant to eliminate what it was told by all the parties, including the United States, and I did represent them, that material contribution was an important part of secondary copyright law. Mr. Coleman, can I just clarify your standard? Because I'm trying to understand, does it have purpose or what I would call intent in it or not? Yes, it has intent. And how so? You have to show... That's where the substantial certain comes. You have to know that the person you're providing the service to is substantially certain to  But that's just knowledge of what the person is going to do. If we listen carefully to the Solicitor General's representative here, it's more like you have to want that thing to occur. So what I'm offering you is not just knowledge. It is intent. And it is intent under the common law. And if you look at the restatement that was the governing restatement at the time that both the 76 Act was passed and the DMCA was passed, it's Section 8A of the Restatement Second of Torts. And it's using the definition of intent for purposes of intentional tort. And all these aiding and abetting torts of common law are intentional torts. And it says there's two ways to show intent. One is what you would think of as purpose, that you actually have the design of carrying out the primary wrongdoer's purpose. But the second thing, and it equally qualifies and is equally intent, is when you provide or do an act knowing that certain results are substantially certain. Under the common law, you are charged with intent. That might be under the common law. But I would think that if you are to read Twitter and then to read Smith & Wesson, which basically was all derived from Twitter, what those two decisions are saying is that that's not the standard we're using for aiding and abetting liability. And I would say, you know, if you read those cases, and there are distinctions in the facts of those cases, but there are three big principles that come out. You know, one is, Mr. Stewart said five times, Twitter said, seek by your action to make it occur, like want to do it, want to have this happen. Smith & Wesson probably adds a couple more times to that. So that's one. The second is this real distinction between nonfeasance and misfeasance. If all you do is say we're not doing anything, that does not suffice. And the third is this distinction between treating the customer just like you treat everybody else, on the one hand, and on the other hand, providing special assistance. And if you look at those three things, you fail on all of them. And that is because those three things are kind of inconsistent with the intent standard that you just laid out. Well, I mean, it would also be inconsistent with Halberstam. Halberstam does not have a purposeful intent. In fact, if you look at the three factors of Halberstam, which I think Congress at least took to be the platonic statement of the common law, I mean, it talks about knowledge. It doesn't talk about purpose at all. And of course, it would have to. Linda Hamilton didn't have the purpose of killing Halberstam. She probably didn't even have that specific purpose of facilitating the sort of night ventures out by her live-in sort of paramour. So what counts at the common law and is always counted at the common law is intent. And intent can be showed either by purpose and design. And so I'm sure that the Smith and Wesson decision was carefully worded to capture that aspect of it. But I don't think there was any occasion there to jettison essentially half of the common law standard, which is this intent where you are charged with the sort of those consequences that are substantially certain to follow from your actions. I would certainly hope not. Now, go ahead. I don't see to broaden out Justice Kagan's question. I don't see your formulation of intent in our copyright cases, either in Kalem, in Grokster, in Sony or in the patent law context in Henry either. That seems to suggest a more affirmative advertisement, promotion, instruction kind of formulation to get to purpose. So can you deal with the copyright case law more generally? I'd be delighted to. And the copyright law, if you go all the way back to the Harper case in 1886, has this notion of material contribution. And material contribution is an absolute critical aspect of copyright secondary liabilities as it's developed over the years. And I think it's important to understand that, yeah, you're right. You know, Grokster, as I tried to explain, didn't focus on material contribution. But that's because the knowledge of specific infringing works was missing there essentially by design of the product. Now, Sony, I think, actually does talk a fair amount about material contribution. And what it talks about is it says a couple of things. In the text around footnote 18, it makes clear that one of the things that made that body of case law inapplicable, and it talks about the dance hall cases and a whole bunch of common law cases, those aren't applicable there because there's no ongoing relationship. And so in that context where it's a one and done sale, then you really are forced to rely on the patent context of a staple article of commerce. So you just launch in and you have no way of ascertaining any knowledge. I think, though, it's very telling that in footnote 19, Judge Justice Stevens refers to the trademark law. Now, he says the trademark law is not as apt as it there is the patent law. But that's because trademark law is actually narrower in most respects. But he specifically cites this court's decision in Inwood Labs. And Inwood Labs could not be clear that the standard is inducement or material contribution as defined exactly as I'm defining it, which is to provide the means of infringement to a customer you know is going to use it to infringe. And I'll give you substantially certain on top of that. Mr. Clement, the United States tells us that the decision of the Fourth Circuit, in your opinion, your position would threaten universal Internet access and emphasizes the problems that would be that are encountered when that decision and your position are applied to a university account shared by thousands of students, maybe 50,000 students and tens of thousands of staff members or a regional ISP. And I really don't see how your position works in that context. But maybe you can explain how it could. So, I think the way that my position works most readily is that the safe harbor, I think provides plenty of room for ISPs to handle things like multi-user accounts, fraternities and the like differently. And you can have a different policy under those. The way this case was litigated below, my friends on the other side, I mean, you know, that chart on page 11, that was a demonstrative. That wasn't even introduced into evidence. They didn't make a big pitch that like our liability should be limited to just those customers. Part of the reason is because what the record does reflect in things that are in evidence, transcript, trial transcript pages 810 to 811 shows that 95% of the customers covered by the 57,000 sort of customers that are part of the universe that makes up the 10,000 infringement, 95% of those are residential customers. Only 5% are business customers. So, I think there's a reason they didn't try to limit their liability to the 5%. And they took a position that was essentially we stand or fall together. What is an ISP supposed to do with a university account that has, let's say, 70,000 users? What is the university supposed to do in your view? The university is supposed to, under those circumstances, the ISP is supposed to sort of have a conversation with the university. Now, the ISP's policy to the university says you can't use this service or allow your service to be used for copyright infringements. So, that's. So, yeah, all right, the ISP tells the university, look, you know, a lot of your 50,000 students are infringing my copyright. Do something about it. Now, the university then has to try to determine which particular students are engaging in this activity. And let's assume it can even do that. And so, then it knocks out 1,000 students. And then another 1,000 students are going to pop up doing the same thing. I just don't see how it's workable at all. Well, look, I'm not sure that this record certainly doesn't support the notion that there are universities that have sort of undifferentiated service to 70,000 students or whatever the hypo is. I don't actually think that's how it works in practice. How does it work in practice? Well, the way it works in practice is with, let's say, let me take something that I know a little bit better, like a hotel. And so, like a hotel has lots of guests. So, the hotel is provided internet service and the hotel then can do things starting with terms of use, but a lot of hotels actually don't provide their guests, at least in a normal way, don't provide their guests with services at a speed that are sufficient to do peer-to-peer downloading, precisely because they don't want to be in the position of having guests that are staying there largely so they can sort of upload and download copyrighted works. And if a particular hotel wants to be, you know, but. Do you think that's what a university should do? So, students can't, students have, are restricted in what they can do? I don't think it would be the end of the world if universities provided service at a speed that was sufficient for most other purposes, but didn't allow the students to take full advantage of BitTorrent. I could live in that world. But, in all events, this isn't a case that's just about universities. We've never sued the universities. We've sued Cox. We've sued Grandayy. And I think it's worth, in thinking about the consequences of this case, I think it's worth taking a quick look at the brief in opposition in the Grandayy case, which is being held for this case, because that's a case where the ISP did exactly what my friend's position would incentivize. Which is they did nothing with the notices. It seems like you're asking us to rely on your good corporate citizenship, too, that you wouldn't go after the university or the hospital or that sort of thing. I mean, if we decide the case in your favor, you could. You're just saying you wouldn't? I don't think that we could. We certainly couldn't readily. And, again, I think that there's going to be a, I mean, first of all, you know, the hospitals are in sort of a different position. They're kind of like more of the intermediary where, you know, and there's no safe harbor that's specific to hospitals and universities. I mean, you know, the Congress was very focused in 1998 on the role of ISPs in all of this. And they wanted to create an incentive for the ISPs to adopt reasonable measures. And I think that would certainly accommodate measures that treat multi-user addresses quite differently from residential customers. If you lose, what is the effect on your copyright holders? Like, let's, you know, because you monitor and then send the ISPs the, the accounts that are downloading the copyrighted material, right? So, you could still try to protect your copyright, but it wouldn't be as deep a pocket and it would be a lot worse, right, if you had to go after the individual users themselves. But you wouldn't be without recourse. We would, we would be without scalable, functional recourse. And if you look at the Seventh Circuit's Amester decision, like even back then, Judge Posner had a nice phrase for what direct infringement is, which is the teaspoon solution to an ocean problem. So, if my clients are limited to direct infringement actions, they are in very, very dire straits, but it's worse than that. Because the key thing about the Safe Harbor is the Safe Harbor is not only what gives the, the ISPs an incentive to behave responsibly, it's also what gives them an incentive to come to the table and have negotiations with the content community. And if you look at the Motion Pictures Association brief, they talk about this at length. And if you look at the report of the Copyright Office, they put up together a 200-page report on 512 and the Safe Harbors. And what they talk about is how important it is for essentially both sides to have skin in the game. I guess if you win, why would they cooperate? If you win, it seems to me that the best response that Cox could have is just to make sure that it doesn't read any of your notices ever again. Because all of your position is based on Cox having knowledge of this. Right now, Cox is agreeing to participate in this notice system. But why doesn't Cox just walk away from the deal and say, you know, we just don't care what our users are doing on our, on our infrastructure? So, if we win and they do that, then they're not going to be able to take advantage of the Safe Harbor. They don't need to take advantage of the Safe Harbor because without knowledge they're not going to have liability. I think there's a concept in the law called willful blindness, Your Honor. And I think willful blindness would satisfy the common law standard for aiding and abetting. And so, somebody can't, you know, if you have like the hammer of the month club and you keep on giving a hammer to somebody who is, you know. So, you think if Cox says we're not interested in reading your notices anymore, that would count as willful blindness? I do. Can I ask a question, separation of powers question here? Justice Alito referred to the policy issues in URU, the policy issues going the other way, the ocean problem on the law. We're obviously debating exactly what purpose means and encompasses in this context. But to go back to Justice Thomas' question, Congress has not enacted a statute here for secondary liability and in our implied rights of actions cases in multiple contexts, Justice Gorsuch referred to earlier, we read those implied rights of action narrowly and let Congress debate issues like the ones you and Justice Alito were discussing. Why shouldn't that be a kind of tiebreaker here of letting Congress solve the issues that you're raising? Well, I think it shouldn't for a couple of reasons. First of all, I don't think you're dealing with an implied cause of action. I think you are dealing with an express cause of action in the Copyright Act. And the question is, to what extent does it reach sort of secondary infringement? And I think at this point, it's too late to say that Congress hasn't endorsed it. And let me point to three things if I could. One is the addition in 1976 to in the basic provision of rights to copyright holders, Congress added the words to authorize. So it's no longer you just have the exclusive rights to do certain things like copy and distribute, but you now have the exclusive right to authorize it. And for those that want to take a peek at a Senate report, those words were added specifically to capture secondary liability. So Congress starting in 76 expressly adopted it. But then the DMCA, for reasons that we've already talked about, I don't think can be reasonably understood, except against the backdrop of secondary liability. And Congress put specific weight in, again, this is a Senate report, but it looked at three contemporaneous cases. There was a Playboy case. I think the case that's most constructive is the Netcom case, which was right, there was a 95 case, and that was a case that said, well, for somebody who's like an ISP, I'm sure my friend will say it's not exactly like the ISP today, but somebody who's very much like an ISP, there was no vicarious liability because they didn't make money off of the infringing, but there was material contribution liability. So that's the evolving common law that Congress is passing. And so I think Congress embodies that in the DMCA safe harbor, but just as a cherry on the Sunday, in the same DMCA provision that I only came across over the weekend, but still is in there, 17 U.S.C. 1201C2 is another provision that sort of says that the anti-circumvention provisions are not designed to change the rules of vicarious and contributory liability. So I think there are multiple textual acknowledgments of vicarious and contributory infringement in the code that distinguish this from your sort of classic implied rights of action. Mr. Clemento, just to follow up on that, I'm taking all that as given. Congress still hasn't defined the contours of what secondary liability should look like. Here we are debating them, right? So shouldn't that be a flag of caution for us in expanding it too broadly? Well, I think that would be a cautionary tale to not go beyond the common law. Well, a cautionary tale maybe to take account of where patent law is that Sony relied on in part, for example. I mean, in Central Bank of Denver, as you well know, the court refused to imply any aiding and abetting liability under the Securities Exchange Act. And, you know, so Sony sits in some tension with our law right there. Isn't that a flag on the field for us? I don't, I mean, you know, Central Bank of Denver, you already have like a made-up cause of action, and the question is, do we make up a bow on the made-up cause of action? I think that's different from what you have in a case like this. So one made-up theory is okay too bad? No, I really do think here, given all the text that you have and the court's precedents, which aren't nothing, that it's too late to sort of say this is all like an implied cause of action. For sure, I accept that, but doesn't it suggest some caution here? Look, it's always good to have caution, but I would look not just to the patent law, I would look to the trademark law, and I would take the trouble to trace it back. All right, but let me ask you this. So the common law, even under your standard, that's not what the Fourth Circuit did, right? It didn't say, did you have specific knowledge of individual users who are infringing, and did you do something special with regard to them such that you were substantially certain that you know that they would, in fact, infringe? We'd have to reverse under your standard too. I don't think so, but- That's what you're handling today. That's not what they held. Well, I think you and I just read the Fourth Circuit case differently. I read the Fourth Circuit opinion by Judge Rushing to specifically say the substantial certainty test is what's being applied and what makes- They applied it in gross, and we've got an amicus brief from some intellectual property scholars that say that was wrong. Well, you had a brief from some other intellectual property lawyers who say that was exactly right. Fair enough, but they did do it in gross rather than say, I have knowledge of a specific student at the computer lab at Georgetown University. That's not what happened in this case. No, but I actually think it is, but it's a little bit opaque in the opinion because this case- A little bit opaque. No, no, but it's opaque for a very specific reason because, you know, this case sort of piggybacks on the earlier BMG decision. And in the BMG decision, the Fourth Circuit says that once you have knowledge that the same customer or address- No, no, not address, not address, because it could be a lot of people at the address. The customer, and that analysis isn't what the Fourth Circuit did. Well, I think the customer did it as to the bill payer, the account holder, which of course is the same unit that Cox uses when there's nonpayment. I appreciate- When Cox doesn't get payment from grandma, they don't- Even under the restatement. I think that is the common law still. I don't think you need-  I know somebody in this group of people was involved and I did nothing. That's not substantial certainty. So with residential customers, I think it is, but in all events, that was ruled on in summary judgment in this case. And then what the Fourth Circuit did, and I don't think you can read this part of the opinion differently, they said that Cox forfeited any argument that they didn't have knowledge to the specific customers. Mr. Coleman, can I just bear down a little bit on your test, because I'm still trying to understand it with respect to intent. You say that the intent aspect of this is established by knowledge that a customer- specific knowledge that a customer is substantially certain to infringe. And I guess where I want to go with that in asking you is, once that is established, is that an inference of intent? Is there something that the defendant could do in response to establish, to rebut that inference, or are you saying that all that is necessary is for the plaintiff to show that and then the intent, to the extent it's an element, is satisfied and that's it? What I would say is I think that's enough on the intent element to get to the jury. It's not enough to get directed verdict in my favor, but it's enough to get to the jury. And Cox can go and they can try to argue that, oh, no, we had the purest intent. We tried really, really hard. Could they point to all the things that they did that they say was enough for the safe harbor, even though the other court found it wasn't? Could they point to those sorts of things as evidence to rebut this suggestion that they intended for this to happen? Yes, but of course I could point to the DMCA email and I think I'd probably do all right on that exchange. Sure. And, you know, keep in mind, this went to a jury and it went to a jury of 12 people who probably didn't want to lose their internet connection. And yet, hearing all the evidence here, they had very little trouble saying this is a case where there is material contribution. This is a case where there should be aiding and abetting liability because of the conduct that took place here. And I guess I would just sort of take a step back from this to say, you know, if you think about this kind of in Halberstam or Twitter terms, you know, there's two kind of elements that are critical. One is the intent element. And if you look at Twitter and you look at Halberstam, the intent level is not purposeful. And then the other question, of course, is material contribution or in aiding and abetting terms, substantial assistance. And I think the one way in which the copyright laws, the trademark laws are a little bit different is I think they do think that when you are providing the means of infringement to somebody, I mean, that's pretty easy to show that that is material contribution, substantial assistance. And so if you're looking to distinguish the FedExes of the world, the electrical companies of the world, I mean, I agree with Mr. Stewart. I thought he did an excellent job of sort of parroting what my answer would have been with respect to the DMCA, but I would also say, you know, there's a difference when you're providing the means of infringement, which is what the ISPs do in these cases. That is going to be material contribution if you're doing it with knowledge of specific customers and what they're likely to do. And that's true in the trademark context as well, where you're providing it, you know, the Inwood case is you have a drug manufacturer who's giving it to somebody and they know that person, that generic person is passing them off as branded pharmaceuticals. And that's where this court said, yeah, there's liability for that. So there was a scenario in the Smith and Wesson case which we didn't quite have to grab hold of because of the way the complaint was framed. But suppose that the complaint had said there's a manufacturer and it provides guns to dealers and it knows to a certainty that there's a specific dealer that's a bad Apple dealer that's passing this on to Mexican drug traffickers. Is the manufacturer then liable for all the harm that that causes? I mean, there was like a separate question of proximate cause in that case that this court didn't reach. I don't know the answer to, but I think, you know, and I think there were questions at oral argument about red flag dealers. And if you had specific knowledge, you were providing them to the red flag dealers. I think that probably would satisfy the intent standard at least at the common law. Again, I don't know all of the details of the PCLAA or whatever it is that was at issue there. So I don't want to sort of speak against any of my other clients. But I do think that with respect to the common law intent, that would be satisfied. What about willfulness? Can you speak to the argument that willfulness here requires that the defendant understand that its own conduct is unlawful? So I think they're wrong about that. I think they're wrong about that for reasons that are textual and also reasons that have to do with kind of the common law and the way that it treats aiding and abetting or secondary liability. So if you think about the common law, you are, if you have aiding and abetting, then you are essentially on the hook for the consequences of the mens rea of the person you're assisting. And your own sort of mens rea beyond aiding and abetting doesn't count. So if I aid and abet a first degree murderer, I'm, you know, either criminally or civilly, I'm on the hook for the first degree murderer. And but whereas if I aid and abet, all my conduct is exactly the same. And I aid and abet somebody in manslaughter, the consequences are different. And then if you look at the text here, the relevant text is 504 of the Copyright Act. It actually doesn't focus on the mental state of the infringer. It asks whether the infringement was willful. And of course, in this context, it's the direct infringer who's doing the infringement. Thank you. Justice Thomas, anything further? Justice Alito? Justice Sotomayor? We are being put to two extremes here. The other side says, there's no liability because we're just putting out into the stream of commerce a good that can be used for good or bad. And we're not responsible for the infringer's decision. We have the other side, which you're moving away from petitioners and the SG's position that the only way you can have aiding and abetting in this field is if you have purpose. All right? And you're saying, we don't have to prove purpose. We have to prove only intent, correct? That's the other extreme. But what Justice Alito said, and some of this is that the internet is so amorphous. And what it can or cannot do, I'm not sure about. We're being told that ISPs only know who their customer is. And their customer could be a region. And if it's a region, to say that because one person in that region continues to infringe, that the ISP is materially supporting that infringement because it's not cutting off the internet for the 50,000 or 100,000 people who are represented by that customer. There is a feeling of, how can I say there's a purpose to participate in that situation? Whereas I could see a purpose on single family homes. Because there, they're usually limited by the number of people. And one could say, if you know that it's one or two or a family of five or whatever number it is, it's small. That surely I'm materially contributing there. How do we announce a rule that deals with those two extremes? So, I mean, you know, my front line answer would be I think the safe harbor takes care of the regional ISPs and frankly, I'm not that worried about the regional ISPs because if that were really the problem, we could go after the regional ISPs. You told me that there were 95% of the infringements here were of residents. So you could go after those 95%. Right. And we could probably figure out who the regional ISP is and then go after its customers. That's why I'm not going to die on the hill at the regional ISPs. And I think you could, I mean, you know, material support, I mean, you know, heaven knows this court remembers from Twitter that, you know, by the time you look at the common law, you had six factors under Halberstam for what is substantial assistance. So there's clearly enough sort of, if you want to, if that's the hypo that's concerning you, then you can certainly sort of come up with a definition of material contribution that carves that out. I think the... Give it to me. What's that? Give it to me. I'm inviting you to help me. And I'm inviting you to take my help. I mean, I don't want to like, you know, it's hard to just absolutely give it away in a case where that's not the way the case was litigated. But I am telling you that, you know, my friend I thought was remarkably candid in admitting that if you adopt their position, that really is an extreme position. The DMCA and the safe harbors are a dead letter. If you carve out regional ISPs, the safe harbor is alive and well. And equally importantly, the incentives for both sides to come and to try to have a reasonable negotiation are alive and well. Justice Kagan? Justice Gorsuch? If we were to, I think Justice Kagan's right that our precedents speak of purpose. And we have two options. One, we could take the additional step and say that because this is an implied-ish cause of action, we're going to construe it very narrowly, look to the patent law. And jam a lot. The other alternative would be to say it's purpose and reverse and remand. And Mr. Malcolms invited you to say whether you thought you could prevail under that standard below. Well, obviously I prefer door number three, but I would also prefer. I understand door number three. Whatever the standard is, I'd prefer a chance to pursue that. And I would think even under purpose, there has to be room for treating somebody that says F the DMCA differently from somebody that tries their level best to comply and doesn't. Thank you. Justice Taylor? You're drawing a distinction between intent and purpose. And you also, though, rely on the Henry case quite a bit from 1912 in the patent context. And there, the court said, there must be an intent and purpose that the article sold will be so used. And then it says it may also be inferred, or its most conspicuous use is one which will cooperate in infringement when sale to such user is invoked by advertisements. So advertisement as an example of when there is an intent and purpose. And then Calum, which is argued that within a week of Henry, back in 1911, Calum's the copyright case, of course. In the reply brief, the other side points out that you will ignore Calum in your brief. But Calum itself says in the copyright context, the defendant not only expected but invoked by advertisement the use of its films for dramatic reproduction of the story. The word advertisement appears in both cases. Henry says intent and purpose. Get your response to that. So let me take him in turn. I mean, Henry says intent and purpose, but it also says you can infer that sort of compound if you know that the user is going to use it unlawfully. And like, you know, I mean, to me, you know, the right way to look at this is consistent with the research. I'm not sure it says that, but anyway, keep going. It, it, it, not maybe in the same line, but I think it says it elsewhere. At least that's what I take from the opinion. Maybe I'm, maybe I'm misreading it. But that's certainly, that's certainly why we were relying on the sort of the Henry case because you were providing it knowing it would be misused. So, so, so that's part of the answer on Henry. But again, then you get to Calum. And Calum, yes, like obviously if you have inducement cases, that's what, that's what advertising goes to. It goes to inducement cases. But inducement cases are, you know, historically if you look at all of the contributory infringement cases, inducement is the smaller subset. And the dominant subset is material contribution where you're providing material support, substantial assistance, went to somebody you know that it's infringer. And that's why, like, you can get the people who are just packing and shipping the bootleg records, right? Like, you know, they don't, like, care what's in the box. They're just getting paid for doing it. But you still say, and I always have said that they are liable. That's, I mean, that's certainly the dominant common law rule. It's the rule in the trademark context as well. So let me just say a word about Calum. I mean, Calum, again, you know, is a case where you have, you know, the promoter of the motion picture that's made from the book. So it's an easy case. And the language they talk about where Justice Holmes goes back to a couple of the Supreme Judicial Court of Massachusetts opinions and talks about indifference, the court specifically says we don't have to get into those niceties here. So what they're relying on in Calum, which is why we ignored it, is the purest form of victim. Got it. Thank you. Justice Barrett. Justice Jackson. Thank you, Counsel. Mr. Rosenkranz, rebuttal. Thank you, Your Honor. Plaintiff's test relies on specific known infringers who are certain to keep infringing. If plaintiffs want to bring an action that is based upon specific known infringers who are certain to keep infringing, they can bring that case under their rule against ISPs. This court cannot affirm on that basis, though, and neither can the courts below. Let's talk about how this case was tried. There is no proof of any specific known infringer that is a human being who actually did any of the things that some of these hypotheticals point out. Even if you focus on households, there is no way to disaggregate precisely for the reason that Justice Gorsuch points out, plaintiffs tried a case in gross as to 57,000 subscribers, no individual circumstances. Plaintiffs never tried to disaggregate in any way as to the people who they see, who they claim can sustain this verdict. Saying that the DMCA shows that there is liability in a world of uncertainty is not how this court reads statutes. You can't infer liability from the blank page, and Congress said not to do that. The DMCA is also no panacea. ISPs have no certainty that they will keep the safe harbor. A lay jury decides whether an ISP has acted reasonably and whether terminations are appropriate. Justice Alito asked what is an ISP supposed to do when confronted with a university? My friend gave an answer, have a conversation. That's a terrible answer from the perspective of the company that is trying to figure out what its legal obligations are facing crushing liabilities. I have an answer. When Justice Barrett asked about recourse, the plaintiffs have recourse. How about a conversation with the ISPs where they talk about how to work out things together? Maybe they kick in a little money. Now, they won't get billion-dollar verdicts, but if they believe that the programs that Cox and others have aren't satisfactory, they can design better programs and help pay for them. If the court has no further questions, we respectfully request that the court below be reversed. Thank you, counsel. The case is submitted.